IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAMONA L.  MCCARTNEY,                §
                                    §
        Plaintiff,                   §
                                    §
V.                                   §        CIVIL ACTION NO. H-11-3948
                                    §
MICHAEL J. ASTRUE                    §
COMMISSIONER OF THE SOCIAL           §
SECURITY ADMINISTRATION,             §
                                    §
        Defendant.                   §

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No.12), Defendant's Motion for Summary Judgment (Document No. 11) and

Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 13). After

considering the cross motions for summary judgment, the administrative record, and the applicable

law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for

Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment

(Document No. 12) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on April 18,
2012. (Document No.9).

## I. Introduction

Plaintiff, Ramona McCartney ("McCartney") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability benefits and for supplemental security income benefits.  McCartney argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, William B. Howard, committed errors of law when he found that McCartney was not disabled.  McCartney argues that she has been disabled since January 29, 2004, due to a neck/right arm injury, arthritis in the legs, poor vision, and hypertension. (Tr. 165).  According to McCartney, the ALJ  erred in his rejection of the opinion offered by her treating health care professional, Byron Young, a certified family nurse practitioner ("CFNP"), that McCartney should quit her light work job as a child care attendant.  She also argues that the ALJ erred in finding that she could perform full time light work in spite of suffering from "marked" limitations in social functioning and "moderate" limitations in concentration, persistence, or pace.  McCartney seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration of the significance of Byron Young's opinion that she quit her light work job as a child care attendant, and to consider whether she could maintain *any* full time competitive employment.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that McCartney was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.  Administrative Proceedings

On August 27, 2008, McCartney protectively filed for SSI and disability insurance benefits

2

claiming she has been disabled since January 29, 2004. (Tr. 115-118, 119-122). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 57-77). McCartney then requested a hearing before an ALJ. (Tr. 79-80). The Social Security Administration granted her request, and the ALJ held a hearing on January 28, 2010. (Tr. 29-56). On March 22, 2010, the ALJ issued his decision finding McCartney not disabled. (Tr.15-25). In his decision, the ALJ found that McCartney was not disabled at any time from January 29, 2004, through the date he issued his decision.

McCartney sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 5- 6). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering McCartney's contentions, in light of the applicable regulations and evidence, the Appeals Council, on September 1, 2011, concluded that there was no basis upon which to grant McCartney's request for review. (Tr. 1-4). The ALJ's findings and decision thus became final. McCartney has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 11). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 12), to which Defendant has filed a Response. (Document No. 13). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 582. (Document No. 5). There is no dispute as to the facts contained therein.

3

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance."

*Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If  the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his March 22, 2010, decision that McCartney was not disabled at step five because she retained the residual functional capacity (RFC) to perform jobs that exist in significant numbers in the national economy.  In particular, the ALJ determined that McCartney had not engaged in substantial gainful activity since January 29, 2004 (step one); that McCartney's hypertension, peripheral neuropathy, status post splenectomy and gastrectomy in 1998, arthritis causing pain in the hips and shoulders, major depressive disorder, and generalized anxiety

6

disorder were severe impairments (step two); that McCartney did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the medical records, the testimony of McCartney, and the testimony of Dr. Richard Pollock, the ALJ concluded that McCartney had the RFC to perform light work. [2] The ALJ further found that based on McCartney's RFC, she could no longer perform her past relevant work as a child care attendant (step four); and that she could perform jobs such as an office helper, a mail clerk, and a photocopier and was not disabled within the meaning of the Act (step five).  As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

**V.  Discussion**

The objective medical evidence shows that McCartney by history, had a splenectomy and gastrectomy in 1998 due to stomach cancer.  The medical records do not show any ongoing medical

---

[2] With respect to her RFC, the ALJ concluded that McCartney could stand and/or walk about six hours in an eight hour workday, sit at least six hours in an eight hour workday, and could lift and/or carry 10 pounds frequently and 20 pounds occasionally.  McCartney, who is right-hand dominant, could do  occasional fine fingering and gross handling.  She could never reach overhead, work at unprotected heights, work with dangerous machinery or climb ropes, ladders, or scaffolds.  She would also require a sit/stand option at will.  Finally, she could perform simple, repetitive one-two-three step tasks performed at a non-forced pace (non-assembly line pace) with only incidental contact with the public.  (Tr. 19).

complications resulting from the splenectomy and gastrectomy or recurrence of stomach cancer.

McCartney has hypertension.   The medical records show McCartney's hypertension was well-controlled with medication.[3]

On September 9, 2003, McCartney was seen by Dr. Dean Halbert at the South East Texas Medical Associates[4] complaining of headaches. (Tr. 317-320).

McCartney was involved in a motor vehicle accident on January 29, 2004. Her car was rear ended. She was treated at the Memorial Hermann Baptist Beaumont Hospital Emergency Room for a thigh contusion. (Tr. 227-239). The ER treatment note shows that McCartney had a full range of motion in her knee/hip. Id.

McCartney followed with Dr. Halbert on February 2, 2004. (Tr. 321-323). She complained of neck and leg pain. The treatment note reflects her upper back was in spasm. Also, her range of motion in the right hip was "mildly reduced." (Tr. 322). X-rays of the cervical spine were consistent with a muscle spasm. (Tr. 324). A right hip x-ray was normal. (Tr. 325).

---

[3] Readings of McCartney's blood pressure from 2003 through 2009 consistently show it was well controlled. For example, September 9, 2003, 100/60 (Tr. 318); January 29, 2004, 112/76, 103/79 (Tr. 228); March 23 2004, 100/70 (Tr. 333); April 23, 2004, 115/79 (Tr. 336); September 17, 2004, 98/80 Tr. 341); October 18, 2004, 90/69 (Tr. 352); October 25, 2004, 104/73, 96/72, 102/76 (Tr. 243); October 29, 2004, 90/69 (Tr. 352); January 25, 2005, 103/74 (Tr. 355); September 5, 2005, 108/76, 118/74, 98/63, 118/74, 112/75 (Tr. 263, 363, 368, 373); September 13, 2005, 110/68 (Tr. 380); November 9, 2005, 100/72 (Tr. 387); February 16, 2006, 112/68 (Tr. 397); March 24, 2006, 120/82 (Tr. 403); March 31, 2006, 120/84 (Tr. 408); April 25, 2006, 112/64 (Tr. 415); May 4, 2006, 104/56 (Tr. 421); January 25, 2007, 112/77 (Tr. 427); March 13, 2007, 101/80, 103/72, 109/70 Tr. 294-295); March 5, 2008, 104/76, 98/69 (Tr. 281, 288); March 21, 2008, 95/69 (Tr. 434, 550); August 26, 2008, 114/74 (Tr. 444); October 8, 2008, 104/69 (Tr. 544); October 14, 2008, 100/64 (Tr. 493); February 9, 2009, 99/69 (Tr. 557); and November 13, 2009, 99/67 (Tr. 573).

[4] The medical records show this is where McCartney received most of her medical care. She was seen by Dr. Dean Halbert approximately fifteen times, once by Marcella Wheeler, a CFNP, and five times by Byron Young, a CFNP.

She was seen a month later on March 9, 2004. (Tr. 326-331). McCartney complained of neck pain and lower back pain that was aggravated by lifting and bending. The exam notes show McCartney had mild tenderness on neck palpation, and mild tenderness of the cervical muscles. Otherwise, her exam was unremarkable. (Tr. 329). McCartney told Dr. Halbert that her motor vehicle accident was "now in legal issue with other driver's insurance company. They do not want to settle. Says she wanted bills for care to be paid and 'pain and suffering.'" Because McCartney reported feeling depressed, tired, had difficulty concentrating, and could not sleep, Dr. Halbert prescribed Lexapro. (Tr. 330). McCartney was told to come back in week so Dr. Halbert could find out how she was doing on Lexapro. At her March 23, 2004, office visit, she still complained of back pain. (Tr. 330-334). Dr. Halbert wrote: "very pleased with Lexapro–feels like it is helping significantly. Mood, anxiety improved." (Tr. 332).

A month later, on April 23, 2004, McCartney reported being pain free, doing much better with depression and that she was " ready to settle her legal issue." (Tr. 335-338).

McCartney was not seen again by Dr. Halbert for several months. She returned for an appointment on September 17, 2004. (Tr. 339-342). She complained of upper back pain and that her shoulders ached. McCartney attributed both to her motor vehicle accident in January. She also reported increased anxiety during the day. According to McCartney, her husband would soon be deploying to Iraq. Dr. Halbert's examination note shows that McCartney's cervical spine was normal and her neck spasms were improving. (Id.) He told her to return in a month.

A month later, on October 18, 2004, McCartney reported her mood was better but she had no relief from pain, especially in the cervical area. (Tr. 343-345). Dr. Halbert described her depression as well controlled. (Tr. 343).

On October 25, 2004, McCartney was treated at the Memorial Baptist Beaumont Hospital Emergency Room for what turned out to be vasovagal episode.  (Tr.  240-259, 347-350, 471-482). Upon admission, McCartney reported shortness of breath, feeling nauseated, and smelling smoke before she fainted  A CT scan of the brain was normal (Tr.260, 482).   The results of a cardiac and GI work up were normal.  (Tr.  351-353).   Her range of motion was intact in all extremities and she denied being in pain.  (Tr.  243).  At a follow up appointment with Dr.  Halbert a few days later on October 29, 2004, McCartney described her condition as improved.  (Tr.  351-353).

McCartney was not seen again by Dr.  Halbert for several months.  At her January 25, 2005, office visit she complained of leg cramps in both legs.  (Tr.  354-356).   The results of her musculoskeletal examination were normal.  (Tr.  355).   She also reported that her counselor suggested she cut back on Lexapro. (Tr.  354).  Dr.  Halbert ordered diagnostic testing to explore why McCartney was having leg cramps.

On February 14, 2005, she had an echocardiogram.  (Tr. 359, 448-452).  Her left ventricular function was normal and she had trace of mitral, tricuspid and pulmonic regurgitation.  (Id).  Results of a bilateral lower extremity venous doppler were normal.  There was no evidence of deep venous thrombosis bilaterally.  (Tr.  360, 470).

On September 5, 2005, McCartney experienced chest pain so she went to the emergency room at the Memorial Hermann Baptist Beaumont Hospital.  (Tr.  262-275, 366-376).  An EKG and all labs were normal.  Chest x-rays were normal.  (Tr.  275, 279).   She was discharged with a diagnosis of bad reflux.

McCartney had a follow-up appointment with Dr.  Halbert on September 13, 2005.  (Tr.  378-383).

10

McCartney returned to the Southeast Texas Medical Associates on November 9, 2005. She was seen by Marcella Wheeler, CFNP. (Tr. 385-390). McCartney complained of visual problems in both eyes and right knee pain. Because she complained that she could not see, she was referred for an ophthalmology consultation, which took place on December 22, 2005. (Tr. 392-394). The eye examination was normal and she was told to return in a year. She underwent a bone density test on November 23, 2005. There was no evidence of osteoporosis. (Tr. 485-489).

The medical records from 2006 show that McCartney was seen by Dr. Halbert on February 16, 2006, for epigastic pain and vomiting. (Tr. 395-399). McCartney reported that she "ate what smelled like bad crawfish 2 days ago then flaming hot wings." (Tr. 395). Dr. Halbert opined she had gastroenteritis, infectious improving.

McCartney was next seen on March 24, 2006. (Tr. 401-404). She complained of fatigue in her legs. Dr. Halbert diagnosed PVD extremity with claudication. She was seen again by Dr. Halbert on March 31, 2006. (Tr. 406-410). McCartney requested a letter for disability. "Pt wants a letter stating she is disabled, unable to work. Hasn't worked since 2003." (Tr. 406). Because of her complaints of leg fatigue, she underwent a lower extremity segmental pressure and wave form test on April 10, 2006. (Tr. 412, 469). There was no evidence of any pressure reducing stenotic lesion in the left lower extremity or right.

At her April 25, 2006, appointment McCartney reported leg cramps in both legs. (Tr. 413-417). She was prescribed Neurontin to help with the symptoms of peripheral neuropathy. At her next appointment, on May 4, 2006, she reported the Neurontin was helping but had made her dizzy. Dr. Halbert responded by lowering the dosage. (Tr. 419-422).

The records from 2007 reveal that McCartney was seen for acid reflux and constant urination

on January 27, 2007.  (Tr.  424-428).  On March 13, 2007, she went to the emergency room at Memorial Hermann Baptist Beaumont Hospital complaining of chest pain and vomiting.  (Tr. 292-313).  The results of an EKG and chest x-ray were normal (Tr.  299, 314).  The exam note shows she had a full range of motion and no spinal tenderness.  (Tr.  293).  McCartney's discharge diagnosis was gastritis.

The medical records from 2008 show that McCartney went to the emergency room on March 5, 2008, seeking attention for right leg pain.  (Tr.  280-290).  The hospital records show a decreased range of motion in her right leg.  She was diagnosed with acute sciatica and prescribed Vicodin for pain relief.

McCartney was seen by Byron Young, CFNP, at Southeast Texas Medical Associates on March 21, 2008, for right leg pain.  (Tr.  431-440,  547-552).  On August 26, 2008, McCartney complained of pain in both legs. (Tr.  441-447).  Neurologically she was intact. (Tr.  446).  In the treatment note, Byron Young.  CFNP,  wrote: "Pt advised to quit working, as this problem only exacerbated with her type of work.  Thank you for your understanding in this matter." (Tr.  447). On October 8, 2008, McCartney was seen by Byron Young, CFNP.  She complained of right hip pain. (Tr.  541-546).  Because of her complaints of hip pain, an x-ray was ordered.  The radiologist noted mild degenerative changes in the right hip with mild sclerotic changes.  (Tr.  540).

At her February 9, 2009, office visit, McCartney complained of extremity pain and in particular, right leg pain.   (Tr.  555-561).  The treatment note reveals her range of motion was decreased on the right side. (Tr.  557).  She was referred for physical therapy at Golden Triangle Physical Therapy.  (Tr.  508, 538-540, 564, 566).  At her initial session on February 24, 2009, she described her pain as an "8" out of "10."  She reported being able to drive and ambulated with a

minimal limp.  (Tr.  539).  She attended nine sessions.  Her last progress as of March 19, 2009, was described as good.  She reported taking no pain medication and sleeping well.  She rated her pain as "1" out of "10".  (Tr.  567-568).

In connection with her application for benefits, a disability determination unit physician, Robin Rosenstock, reviewed McCartney's medical records and completed a physical functional capacity on November 24, 2008.  (Tr.  498-505).  Dr.  Rosenstock opined that McCartney had no postural, manipulative, visual, communicative, or environment limitations.   As to physical limitations, Dr.  Rosenstock concluded McCartney could occasionally lift and/carry up to 50 pounds, frequently lift and/carry up to 25 pounds, stand at least 2 hours, sit about 6 hours out of an 8 hour workday, and had no limitations pushing or pulling.  Id.

Dr.  Prasada Nalluri, a specialist in Internal Medicine, was asked to evaluate McCartney's allegations that she was disabled due to arthritis of the legs, vision problems, and hypertension.  The examination took place on October 14, 2008.  (Tr.  492-494).  McCartney had an x-ray, which showed mild degenerative changes in the right hip with mild sclerotic changes noted along acetabular side of the joint.  (Tr.  495, 540).  The results of Dr.  Nalluri's October 14, 2008, examination revealed that neurologically, the cranial nerves II through XII were intact.  McCartney's motor strength was 5/5 bilateral and her reflex was 2+.  Babinski and Romberg tests were within normal limits.  She could squat without difficulty.  Straight leg raising test was negative.  McCartney had difficulty heel to toe walking and could not hop.  Dr.  Nalluri wrote:

> No cyanosis, calf tenderness or edema.  Range of motion in the right hip decreased.
> Flexion decreased to 80 degrees and normal is 100 degrees.  Extension within normal
> limits of 30 degrees.  Abduction decreased to 30 degrees and normal is 40 degrees.
> Abduction decreased to 10 degrees and normal is 20 degrees.  Internal rotation
> decreased to 30 degrees and normal is 40 degrees and external rotation decreased to

40 degrees and normal is 50 degrees.  (Tr.  493-94).

Based on the examination results and the x-ray, Dr.  Nalluri opined that McCartney had peripheral

neuropathy, arthritis of multiple joints and right hip pain.  (Tr.  494).

McCartney also underwent two mental evaluations.   The first, on April 29, 2009, was

arranged by the Commissioner.  (Tr.  510-513).  The second, on May 13, 2009,  was arranged by and

paid for by McCartney's counsel.(Tr.  533-535).  On April 29, 2009, she was evaluated by Kevin

Mark Correia, PhD.  He observed that McCartney drove herself to the appointment and she told him

she had no difficulty driving.  He noted she was able to sit for thirty minutes without difficulty, and

ambulated without use of an assistive device.  Dr.  Correia wrote that McCartney had a "tendency

to exaggerate her stated impairments."  (Tr.  510).  Dr.Correia wrote:

Appearance, Behavior, and Speech:
Ms. McCartney spoke clearly.  She seemed relaxed and comfortable and maintained
a good disposition.  She was talkative, friendly and cooperative.

Thought Process:
Ms. McCartney reports having some thoughts of suicide immediately after finding
out she had cancer in the late 1990's, but she otherwise denies ever seriously
contemplating acts of self-harm or having engaged in any such acts.  She similarly
denies ever being so angry that she attempted to seriously harm anyone else.

Perceptual Abnormalities:

Ms. McCartney denies any history of unusual experiences, thoughts, or feelings, and
there was nothing in her behavior or history to suggest otherwise.

Mood and Affect:
Ms. McCartney displayed an appropriate range and intensity of affect.  It was
universally appropriate to content of speech.  Affect was generally very pleasant,
even in difficult situations.  She responded to and returned humor.  There was no
evidence of depression or anxiety.

Sensorium and Cognition:

14

Ms. McCartney was fully oriented to time, place and person. She fully understood her disability status and compensation issues. She demonstrated basic abstract reasoning skills.

Memory:
Ms. McCartney was able to remember basic immediate information. Her remote memory appeared intact.

Concentration:
Ms. McCartney displayed good concentration on tasks presented to her. She was not unusually distractable.

Judgment and Insight:
Judgment is normal and insight into her basic difficulties is mostly present. She is able to understand appropriate behavior. (Tr. 513).

McCartney had a Global Assessment score of 80. Overall, Dr. Correia opined:

Ms. McCartney does not appear to suffer clinical levels of distress on any psychoemotional dimension. Her memory shows no clear and consistent deficits, affect appears normal, cognitions are clear and she interacts appropriately. Though she reports chronic pain problems for which she continues to see appropriate treatment, she appears to have made an appropriate psychosocial adjustment to this condition at present. Prognosis is good. Ms. McCartney appears to be reasonably psychologically healthy and should remain so. She needs to be evaluated by a qualified physician for proper assessment of her pain complaints so an appropriate course of treatment can be initiated. (Tr.513).

Approximately a month later, on May 13, 2009, McCartney was evaluated by Jaime Ganc, a physician, who is board certified in psychiatry and neurology. McCartney described her problem as follows: "I was working in a childcare center and I started having pain in my right hip. I began getting depressed and panicked." (Tr. 533). Dr. Ganc administered several tests including a personal questionnaire, the Beck Depressive Inventory Scale, the Beck Anxiety Inventory Scale, Sentence Completion Test, and the House-Tree-Person Drawing. In addition to the tests, Dr. Ganc conducted a mental status examination. Dr. Ganc wrote:

15

**Mental Status Examination**
The patient is a 52-year old woman.  She appears her stated age.  She is 5'1" tall and weighs 160 lbs.  She is clean and alert.  She seems sad and has limited eye contact.  She is worried, anxious, shaky, turning around and tense.  She verbalizes in a logical and coherent manner with no evidence of any psychotic thinking.  Her main concern is her chronic pain and her inability to go back to work.  She has a sense of failure.  She denies suicidal or homicidal thoughts.  No auditory or visual hallucinations.  She is oriented x 4.  Memory for past and present events was preserved.  Affect was depressed and anxious and mood was appropriate.  Attention and retention span was decreased and she retained 4 out of 5 objects.  Intelligence is average.  Insight and judgment for reality testing was preserved.

**Daily Activities:**
Ms.  McCartney lives with her husband.  She has a 15-year-old son who lives with her.  She spends most of her days cooking and doing light work.  She states that most of the time she feels that she needs to rest and stop doing what she is doing.  She has been isolating herself.  She has no interest in social activities.  She is still able to handle her own personal appearance and personal hygiene.

**Summary of Psychological Testing:**
In the Beck Depressive Inventory Scale she scored 19 that put her at the moderate to severe level of depression.  In the Beck Anxiety Inventory Scale she scored 25 that put her at the moderate level of anxiety.  The Sentence Completion Test revealed an individual who is depressed.  She is concerned about her physical condition.  She has a sense of worthlessness, isolation and confusion.  She is a person who puts a lot of emphasis on her work and now she feels that she cannot do much.  The House-Tree-Person Drawing revealed an individual who has been isolating herself.  She is confused, sad with a sense of being injured with no psychological defenses.  (Tr. 534).

She had a GAF of 48.  With respect to McCartney's prognosis, Dr.  Ganc opined:

> The prognosis in this case is poor.  Mrs.  McCartney has been suffering from severe pain in her right hip.  This has incapacitated her completely to do any type of work that requires lifting and physical activities.  (Tr.  534).

Dr.Ganc also completed a form entitled "Medical Assessment of Ability to do Work Related Activities (Mental).  (Tr.  536-537).  Dr.  Ganc rated as "good" McCartney's ability to maintain personal appearance; and understand, remember, and carry out simple job instructions.  She was rated as "fair" in the following areas:  ability to follow work rules; relate to coworkers; use judgment;

16

interact with supervisors; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed but not complex job instructions; behave in an emotionally acceptable manner; and demonstrate reliability.  Finally, she was rated as being "poor" in two areas: ability to deal with the public and deal with work stressors; and ability to react predictability in social situations.

A non-examining state agency psychologist completed a Psychiatric Review Technique form on May 11, 2009.  (Tr.  516-529).  The evaluator, Jim Cox, Ph.D., opined that McCartney had no medically determinable impairments.

Testifying at the January 28, 2010, hearing was Dr.  Richard Pollock, a neuropsychologist. Based on his review of McCartney's medical records, Dr.  Pollock opined that she did not meet listing 12.04(major depressive disorder) or listing 12.06(generalized anxiety disorder).  (Tr.  45). As to McCartney's ability to function in a work setting, Dr.  Pollock stated she would have some limitations in her ability to function in a work setting.  (Tr.  45-46).  Specifically, Dr.  Pollock testified that McCartney's interactions with the general public should be limited to less than three hours a day.  Dr.  Pollock further testified that on a one-to-one basis, McCartney would have no problems interacting with others.  (Tr.  46).  He opined she would need to work in a non-stressful environment at a non-forced pace.  (Tr.  46).  When questioned about McCartney's ability to understand, remember, and carry out complex tasks, he opined that she could perform simple activities involving two and three steps or something she was familiar with.  (Tr 46).  Dr.  Pollock testified about whether McCartney satisfied the "paragraph B" criteria.  He testified that McCartney had no episodes of decompensation .  (Tr.  47).  He further opined that she had "mild" difficulties in activities of daily living (Tr.  46), had "moderate" difficulties in concentration, persistence and

pace (Tr 47), and had "marked" difficulties in social functioning.  (Tr.  47).  He testified there was

no evidence that McCartney met any evidence of the "paragraph C" criteria.  (Tr.  47).  He was also

questioned about Dr.  Ganc' report and his conclusion that McCartney would relate "poorly" in

social situations.  In response, Dr.  Pollock stated that he had taken this into account when he opined

that McCartney's contact with the general public should be limited to no more than three hours a

day.  (Tr.  47).  Finally, when questioned about McCartney's conflicting GAF scores ranging from

80 to 48, Dr.  Pollack testified that in his experience it was unusual to see someone, within a few

months of each respective exam, with such a large discrepancy.  According to Dr.  Pollock, in his

professional opinion,  "the reality is probably somewhere in between."[5]  (Tr.  52-53).

Here, substantial evidence supports the ALJ's finding that McCartney's hypertension,

peripheral neuropathy, status post splenectomy and gastrectomy in 1998, arthritis causing pain in the

hips and shoulders, major depressive disorder and generalized anxiety disorder were severe

impairments at step two, and that such impairments at step three, individually or in combination, did

not meet or equal a listed impairment, and that she had the RFC to perform a full range of light work

that was limited as follows:

claimant can stand and/or walk about six hours in an eight hour workday.  She can

---

[5] The Global Assessment Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.  The GAF score considers "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness."  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  at 34.  A GAF score of 71 to 80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork."  *Id.*

sit at least six hours in an eight hour workday.  She can lift and/or carry 10 pounds frequently and 20 pounds occasionally.  However, the claimant, who is right-hand dominant, is limited to occasionally fine fingering and gross handling and never reaching overhead; working at unprotected heights; working with dangerous machinery; or climbing ropes, ladders, or scaffolds.  She would also require a sit/stand option at will.  In addition, she is restricted to simple, repetitive one-two-three step tasks performed at a non-forced pace (non-assembly line pace) with only incidental contact with the public.  (Tr. 19)

McCartney argues that the ALJ erred in finding that she could perform full time light work given that she suffered from "marked" limitations in social functioning and "moderate" limitations in concentration, persistence or pace.  According to McCartney, when Dr.  Pollock testified about the "Paragraph B" criteria, and had he found a marked limitations in one other area (concentration, persistence and pace), she would have satisfied the "Paragraph B" criteria and been disabled.  McCartney suggests that Dr.  Pollock's conclusion that she was "marked" in social functioning and "moderate" in concentration, persistence and pace, was sufficiently close to meet "Paragraph B", especially when considered with the evaluation by Dr.  Ganc.

To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  The record clearly shows that Dr.  Pollock did not testify or suggest that McCartney was "close" to being "marked" in two areas.  Dr.  Pollock's testimony was explicit that she had no areas of decompensation, was "marked" in social functioning and had "moderate" limitations in concentration, persistence or pace.  Based on this testimony, the medical records and Dr.  Ganc's evaluation, the ALJ limited McCartney to light work that involved simple, repetitive one-two-three step tasks performed at a non-forced pace with only incidental contact with the public.  This

19

limitation was consistent with the objective medical evidence.

The ALJ incorporated all of the medical opinions in determining McCartney's RFC for light work.  In particular, with respect to physical limitations, he found her hypertension was well controlled and as to her status post splenectomy and gastrectomy that she had no medical complications following her surgery in 1998.  Because of her complaints relating to peripheral neuropathy and arthritis in the hips and shoulders, the ALJ limited her to occasional fine fingering and gross handling and no reaching overheard, no working at unprotected heights, no working with dangerous machinery and no climbing ropes, ladders, or scaffolds, and that she would require a sit/stand option at will.  Also, in recognition of her depression and anxiety, she was restricted to simple, repetitive one-two-three step tasks performed at a non-forced pace (non-assembly line pace) with only incidental contact with the public.  This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial

evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d

172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight

than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any

physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting

*Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and

diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability

status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical

opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's

opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling

weight on the issue of disability, in most cases such opinions must at least be given considerable

deference.  *Id.*   Again, the Social Security Regulations provide guidance on this point.  Social

Security Ruling 96-2p provides:

[A] finding that a treating source medical opinion is not well supported by medically

acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion."  *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

McCartney contends that the ALJ erred by disregarding the disability opinion of her treating health care professional, Byron Young, CFNP, that because of her ongoing medical problems she should quit her job as a child care attendant.  The Commissioner responds that the ALJ weighed the

medical opinions including that of Byron Young, CFNP, in accord with 20 C.F.R. §404.1527(d) and set forth specific reasons for the weight given the various opinions.  According to the Commissioner, Byron Young's statement was considered in context with the other medical records and opinions offered by other examining and non-examining physicians.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> In terms of the claimant's alleged physical impairments, she proclaims disability due to stomach impairment, hypertension, peripheral neuropathy, and arthritis causing pain in the hips and shoulders since January 2004.  The medical evidence substantiates the claimant underwent a splenectomy and gastrectomy in 1998 because of stomach cancer (Exhibit B2F, page 8).  Moreover, the claimant was able to sustain employment subsequent to these procedures.  However, the evidence does not reflect any further abdominal pain or complications since that time period.  Nevertheless, treatment notes indicate that the claimant was involved in a motor vehicle accident in January 2004.  However, subsequent to the accident, she was able to ambulate without assistance and she exhibited normal grip strength in the upper extremities as well as full range of motion in the hips and knees (Exhibit B1F, page 4).  Furthermore, the claimant's range of motion was intact in all extremities in October 2004 (Exhibit B1F, page 19).

> Since the alleged onset date of disability, the claimant's hypertension has been controlled by medication (Exhibits B1F and B2F).  Furthermore, she has not required hospitalization or emergency medical treatment for symptoms associated with hypertension.  Cardiovascular examinations have also confirmed normal heart rate and rhythm (Exhibits B1F, pages 19 and 70 and B2F, page 55).  Likewise, the claimant's echocardiograms have been normal (Exhibits B1F, pages 40 and 75 and B2F, page 45).  Diagnostic imaging of the chest has also illustrated a normal heart with no evidence of an active inrathoracic process (Exhibit B1F, page 90).  Additionally, exercise stress testing has been normal (Exhibit B2F, page 152).

> The claimant's upper and lower extremity pain has not been as severe as she has alleged.  A bilateral lower extremity venous Doppler confirmed the absence of deep venous thrombosis in February 2005 (Exhibit B2F, page 46).  Similarly, lower extremity segmental pressure and wave form testing in April 2006 demonstrated the absence of pressure reducing stenotic lesions in the lower extremities (Exhibit B2F, page 98).  The claimant does not require an assistive device for ambulation (Exhibit B7F, page 2).  Treatment notes indicate that the claimant occasionally endorsed lower

extremity pain prior to 2008; however, she regularly exhibited full range of motion in the extremities as well as normal gait and balance (Exhibit B2F). Conversely, in 2008, the claimant's reports of back and leg pain became more consistent. The record reflects that the claimant was advised to quit her job as a child care attendant because the work exacerbated her symptoms (Exhibit B2F, page 133). However, it is important to note that she was not advised to abstain from all work related activity.

A consultative physical examination in October 2008 revealed only slightly decreased range of motion in the hips. Furthermore, straight leg raise tests were negative. The claimant also exhibited the ability to squat and heel/toe walk (Exhibit B3F, page 4). In addition, an x-ray of the right hip during that time showed merely mild degenerative changes (Exhibit B3F, page 5).

In addition to her physical impairments, the claimant has also alleged major depressive disorder and generalized anxiety disorder. The claimant has endorsed apprehensiveness, irritability, decreased memory, nervousness, mood swings, crying spells, and insomnia (B2F, pages 14 and 27). However, she acknowledged that she was functioning well (Exhibit B2F, page 14). Furthermore, the claimant reported that her psychotropic medication significantly improved her mood and anxiety in March 2004 (Exhibit B2F, page 18). Her cognitive abilities and emotional stability have also been assessed as normal (Exhibit B2F, page 131). While the claimant alleged that her symptoms of depression and anxiety returned in September 2004, she admitted that she had stopped taking her psychotropic medication (Exhibit B2F, page 27). A follow up examination the following month confirmed that her symptoms were improved with medication (Exhibit B2F, page 30).

A consultative psychological examination in April 2009 revealed clear speech, very pleasant affect, and normal thought process without delusions, hallucinations, or suicidal/homicidal ideations (Exhibit B7F, page 4). The record reflects that there was no evidence of depression or anxiety. Furthermore, the claimant was able to remember immediate and remote information and she exhibited good concentration (Exhibit B7F, page 5). She also acknowledged that she has the ability to take care of her own personal hygiene, prepare meals, perform household chores, shop, drive, and manage funds (Exhibit B7F, pages 2 and 3). Moreover, the claimant's global assessment of functioning score was 80, which is indicative of no more than transient and expectable psychological impairment. Consultative examining psychologist Dr. Kevin Correia opined that the claimant did not appear to suffer clinical levels of distress on any psychoemotional dimension (Exhibit B7F, page 5).

The following month, the claimant was evaluated by psychiatrist Dr. James Ganc. As with the previous psychological examination, the claimant exhibited clear speech, normal thought process, and intact memory and concentration. The Beck Depressive Inventory Scale demonstrated moderate to severe depression while the Beck Anxiety

Inventory revealed moderate anxiety (Exhibit B10F, page 5).  Although, Dr.  Ganc assessed a GAF score of 48, which is indicative of serious psychological impairment, he opined that the claimant's ability to make occcupational adjustments including maintaining attention/concentration, relating to co-workers and supervisors, and functioning independently, was fair.  He further assessed that the claimant maintained the ability to carry out both simple and complex job instructions (Exhibit B10F, page 8).  Nevertheless, Dr.  Ganc opined that the claimant is completely incapacitated to perform any type of work that requires lifting and physical activities because of pain. Despite the fact that Dr.  Ganc has some training in Neurology, it is clear that the primary purpose of his evaluation of the claimant was of a psychiatric nature.  In fact, he did not perform any physical examinations on this date.  Furthermore, the claimant confirmed that she maintains the ability to prepare meals, perform household chores, and drive (Exhibit B10F, page 5).  Hence, Dr.  Ganc's opinion as to the claimant's physical limitations is given little weight.

The January 2010 hearing revealed that the claimant stopped working in August 2008.  She testified that she quit her job because she was unable to lift heavy objects due to back pain.  The claimant also reported that she often experiences right hip pain that radiates down her leg.  Yet, she has exhibited normal range of motion in the hips and lower extremities.  In addition, the claimant acknowledged that physical therapy has improved her symptoms.  Although the claimant asserted that she has been unable to afford physical therapy or other forms of pain management, she has not provided any objective evidence that she does not quality for free treatment or treatment at a reduced cost.  The claimant also endorsed left finger pain and hand swelling that has inhibited her ability to lift and carry objects.  Conversely, she is able to write a letter, button clothing, and tie her shoes.  Additionally, the claimant reported right foot pain.  Interestingly, the claimant confirmed that she is not currently taking any pain medication.  The claimant testified that she has been treated in the past for depression and anxiety.  However, she admitted that she is not currently receiving mental health counseling because she is unable to afford it. Again, the record does not reflect that the claimant does not qualify for free or reduced cost mental health treatment.  Furthermore, she maintains the ability to prepare meals, perform household chores, shop, take care of her parents, and drive. She also reads for leisure and goes to church.

Medical expert Dr.  Richard Pollock testified that the claimant's mental impairments do not meet or medically equal a listing.  He recommended that the claimant's contact with the general public be limited to less than three hours per day.  In addition, Dr.  Pollock restricted the claimant to simple, one to three step tasks at a non-forced pace.  Dr.  Pollock assessed that the claimant has mild limitations in activities of daily living; marked limitations in social functioning; moderate limitations in concentration, persistence and pace; and no episodes of decompensation.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Although she has received treatment for the allegedly disabling impairments, that treatment has been essentially conservative in nature. Furthermore, the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in her favor, but the medical records reveal that the medications have been relatively effective in controlling her symptoms. However, despite complaints of allegedly disabling symptoms, the claimant is not currently taking any medications for her symptoms.

As for the opinion evidence, the record does not contain any opinions from treating physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. However, consultative examining psychiatrist Dr. Ganc apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Thus, the undersigned generally concurs with the reconsideration assessment of the state agency medical examiners.

In sum, the above residual functional capacity assessment is supported by the claimant's medical records, the reports of consultative medical examiners, and the medical expert's testimony. The claimant's testimony is inconsistent with the medical evidence as she severely minimizes her ability to perform work-related activities. (Tr.20-23).

As to McCartney's contention that the ALJ erred by discounting Byron Young's opinion that she should quit work as a child care attendant, nurse practitioners are not "acceptable medical sources" that can provide evidence to establish whether the claimant is disabled. 20 C.F.R. §§ 404.1513(d) & 416.913(d). In addition, even assuming that he had been an acceptable medical source, his opinion that McCartney was disabled and should not work as a child care attendant was not determinative and binding on the ALJ. The law is clear that "among the opinions by treating doctors

that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'" *Frank v. Barnhart*, 326 F3d 618, 620(5th Cir. 2003). While his opinion was not entitled to controlling weight, that is not to suggest that it was not entitled to any weight. The regulations provide that opinions from "other sources" such as nurse practitioners and therapists, are evaluated pursuant to SSR 06-03p, (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). Factors to be considered include the nature and extent of the relationship between the source and the individual; the source's qualifications; the source's area of speciality or expertise; the degree to which the source presents relevant evidence to support his or her opinion; whether the opinion is consistent with other evidence; and any other factors that tend to support or refute the opinion. See 20 C.F.R. §§ 404.1527(d) & 416.927(d). Here, the ALJ thoroughly evaluated the objective medical evidence, including the opinion of Bryan Young. The ALJ wrote: "[t]he record reflects that the claimant was advised to quit her job as a child care attendant because the work exacerbated her symptoms (Exhibit B2F, page 133). However, it is important to note that she was not advised to abstain from all work related activity." (Tr. 20-21). Indeed, other than this suggestion by Byron Young, no other health provider at Southwest Texas Medical Associates suggested she could not work, and Byron Young did not state that McCartney could perform no work. He advised that she discontinue her current work. It is also clear that this suggestion was incorporated into the ALJ's finding at Step 4 when he concluded that McCartney could not return to her prior work as a child care assistant and he proceeded to step 5.

The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision. The ALJ's decision is a fair summary and characterization of the medical records and medical expert testimony.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'"  *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, McCartney testified about her health and its impact on her daily activities.  She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition.  McCartney testified that she quit working in August 2008 because she had a problem lifting.  According to McCartney, "the reason why I quit work is because of the– me lifting up one of the babies, I pulled a muscle and I wasn't able to continue work, because every – whenever I pick

28

up anything that's heavy, causes my back to hurt.  Even lifting up heavy stuff will cause me to have pain."  (Tr. 35).  She stated that she loved working with the babies.  (Tr. 40).  McCartney testified she often has pain in her right hip and that the pain radiates to her legs.  According to McCartney, she no longer takes Lexapro and Vicodin because the medications were too strong.  (Tr. 36, 43).  McCartney testified about other home stressors.  She stated that her husband served two terms in Iraq and came home with post traumatic stress disorder.  (Tr. 36).

McCartney testified that physical therapy helped but she had to stop going when insurance stopped covering the cost and she did not have the money to pay for it out of pocket.  (Tr. 36-37).  Similarly, she  testified that counseling helped but she stopped counseling sessions when insurance would no longer pay and she could not afford to continue.  (Tr. 38-39).

With respect to left finger pain, McCartney testified that she fell and injured her left hand and as result can no longer lift or hold anything and she also has trouble writing.  (Tr. 37)[6].  In addition to finger pain, she stated that her fingers sometimes swell up.  (Tr. 37).  McCartney did not wear a right shoe to the hearing because the bottom and top of her foot hurt.  (Tr. 38).  McCartney estimated that she could sit without problem between fifteen and thirty minutes.  (Tr. 38).  She stated that she tires fast and "just  gives up."  (Tr. 38).  McCartney stated that she has difficulty bending and stooping and needs to pull on something to get up.  (Tr. 40).  She estimated she has approximately fifteen good days a month, and fifteen bad days a month.  (Tr. 44).

She was questioned about her daily activities.  McCartney stated that she takes care of her parents who are ill.  (Tr. 40).  According to McCartney, she goes with them to the grocery store and makes sure they take their medicine.  Her assistance does not include doing their laundry, helping

---

[6] The medical records show that McCartney is right handed.  (Tr. 431-440).

them bathe, or cleaning their house.  (Tr.  40-41).  With respect to her activities around her own

home, she testified that her husband cleans house, goes to the grocery and cooks.  (Tr.  41).  She is

able to sweep, dust, and make her bed.  She reads but has problems with comprehension.  (Tr.  44)

She has few hobbies.  (Tr.  43).  Besides going to church, she avoids groups, and does not go to

movies or restaurants. (Tr.  42, 44).  Because of pain in her shoulder, fingers and limited vision, she

seldom drives.  (Tr.  41-42).

Based on the reasons which follow, the ALJ rejected McCartney's testimony as not fully

credible:

> The January 2010 hearing revealed that the claimant stopped working in August
> 2008.  She testified that she quit her job because she was unable to lift heavy objects
> due to back pain.  The claimant also reported that she often experiences right hip pain
> that radiates down her leg.  Yet, she has exhibited normal range of motion in the hips
> and lower extremities.  In addition, the claimant acknowledged that physical therapy
> has improved her symptoms.  Although the claimant asserted that she has been
> unable to afford physical therapy or other forms of pain management, she has not
> provided any objective evidence that she does not quality for free treatment or
> treatment at a reduced cost.  The claimant also endorsed left finger pain and hand
> swelling that has inhibited her ability to lift and carry objects.  Conversely, she is able
> to write a letter, button clothing, and tie her shoes.  Additionally, the claimant
> reported right foot pain.  Interestingly, the claimant confirmed that she is not taking
> any pain medication.  The claimant testified that she has been treated in the past for
> depression and anxiety.  However, she admitted that she is not currently receiving
> mental health counseling because she is unable to afford it.  Again, the record does
> not reflect that the claimant does not qualify for free or reduced cost mental health
> treatment.   Furthermore, she maintains the ability to prepare meals, perform
> household chores, shop, take care of her parents, and drive.  She also reads for leisure
> and goes to church.

> Medical expert Dr.  Richard Pollock testified that the claimant's mental impairments
> do not meet or medically equal a listing.  He recommended that the claimant's
> contact with the general public be limited to less than three hours per day.  In
> addition, Dr.  Pollock restricted the claimant to simple, one to three step tasks at a
> non-forced pace.  Dr.  Pollock assessed that the claimant has mild limitations in
> activities of daily living; marked limitations in social functioning; moderate
> limitations in concentration, persistence, and pace; and no episodes of

decompensation.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Although she has received treatment for the allegedly disabling impairments, the treatment has been essentially conservative in nature. Furthermore, the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in her favor, but the medical records reveal that the medications have been relatively effective in controlling her symptoms. However, despite complaints of allegedly disabling symptoms, the claimant is not currently taking any medications for her symptoms.

As for the opinion evidence, the record does not contain any opinions from treating physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. However, consultative examining psychiatrist Dr. Ganc apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exists good reasons for questioning the reliability of the claimant's subjective complaints. Thus, the undersigned generally concurs with the reconsideration assessment of the state agency medical examiners.

In sum, the above residual functional capacity assessment is supported by the claimant's medical records, the reports of consultative medical examiners, and the medical expert's testimony. The claimant's testimony is inconsistent with the medical evidence as she severely minimizes her ability to perform work-related activities. (Tr. 22-23).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ found McCartney not credible regarding her daily activities. It was proper for the ALJ to consider inconsistencies between McCartney's hearing testimony and the objective medical evidence when evaluating her credibility.

*See SSR* 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.". *Id.* "The [ALJ] must also look at statements the individual made to [the agency] at each prior step of the administrative review process[.]").   Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that McCartney, at the time of the hearing, was fifty-four years old, and had completed high school.  The ALJ questioned Cecile Johnson, a vocational expert ("VE"), at the hearing about McCartney's ability to engage in gainful work activities.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ,

the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q.  All right, assume with me a person of the same age, education, vocational background as the claimant.  Now further assume with me the following, hypothetical number one: under this hypothetical such a person could lift at the level of light as defined by the Labor Department's Dictionary of Occupational Titles, but should be allowed the option to sit or stand, which I define as at will.  No climbing ropes, ladders, or scaffolds.  Only occasional fine fingering and gross handling.  No over head reaching.  Limited to simple, repetitive 1-2-3 step tasks, under taken at a non-forced pace, also known as a non-assembly line pace.  Interaction with the public limited to no more to– incident–incidental in nature.  No working at unprotected heights or around dangerous machinery.  Could this person do any of the claimant's past work.

A: No, sir.

ALJ: Just a moment, please.  You do have a high school education?

CLMT: Yes sir, I do.

Q.  Are there any jobs in the economy such a person could do?  If so, specify those jobs having the highest exertional level first.

A.  Yes, sir.  There are some jobs.  One would be that of an office helper, 239.567-010.  About 5,000 jobs statewide, and 190,000 nationally.  A second one would be that of a mail clerk, 209.687-036, 7,000 jobs statewide and 290,000 nationally.  There would be some erosion in that because we would not — I would not consider putting her in any kind of (inaudible) mail.  Okay.  A third one would be ---

Q.  Well how much erosion?

A.  Fifty percent.

Q.  So really you're talking about 3,500?

A.  Well, these, these numbers are an estimate.  There's I'm sure more than 3,500 but say ---- yes.

Q.  Well, give me your estimate without the erosion.

A.  About 4,000.

Q.  And nationally, with the erosion?

A.  Nationally oh, about 110,000.

Q.  Any other jobs?

A.  A third one would be that of a photocopy machine operator, 207.685-014; 3,500 jobs statewide and 165,000 nationally.

Q.  Hypothetical number two: this one is same as hypothetical number one, but add as well this person requires a minimum of eight unscheduled breaks a day, lasting 15 to 20 minutes each.  Any jobs?

A.  No, sir, there would not be any jobs.  (Tr.  50-51).

In addition, McCartney's counsel questioned the VE.  Based on counsel's questions, the VE testified that if an unskilled worker like McCartney missed more than one day a month of work, it would make it difficult to maintain employment.  (Tr.  51-52).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that McCartney was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that McCartney could perform light work with restrictions.  All the jobs identified by the VE were consistent with McCartney's RFC, and are types of jobs that could be performed given McCartney's RFC, age and education.   Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the

vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that McCartney was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that McCartney  was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

 ORDERED Plaintiff's Motion for Summary Judgment (Document No. 12), is  DENIED, Defendant's Motion for Summary Judgment (Document No.  11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 11th day of October, 2012

Frances H. Stacy
United States Magistrate Judge